IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

FLOSSIE DENISE PETERSON,           )
                                   )
    Plaintiff,                     )
                                   )
v.                                 )    CASE NO.: 3:17-cv-247-GMB
                                   )    [WO]
NANCY A. BERRYHILL, Acting         )
Commissioner, Social Security      )
Administration,                    )
                                   )
    Defendant.                     )

## **MEMORANDUM OPINION AND ORDER**

On March 25, 2014, Plaintiff Flossie Denise Peterson applied for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act, alleging a disability onset date of September 1, 2013. Peterson's applications were denied at the initial administrative level. Peterson then requested a hearing before an Administrative Law Judge ("ALJ"). The ALJ held a hearing on August 17, 2015, and on January 28, 2016 he denied Peterson's claims. Peterson requested a review of the ALJ's decision by the Appeals Council, which denied her request on February 17, 2017. The ALJ's decision thus became the final decision of the Commissioner of the Social Security Administration (the "Commissioner") as of February 17, 2017.

Peterson's case is now before the court for review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). Under 28 U.S.C. § 636(c)(1) and Rule 73 of the Federal Rules of Civil Procedure, the parties have consented to the full jurisdiction of the undersigned United States Magistrate Judge. Based on a careful review of the parties' submissions, the relevant

law, and the record as a whole, the court concludes that the decision of the Commissioner is due to be REVERSED and this matter REMANDED to the Administrative Law Judge for proceedings consistent with this opinion.

## I. STANDARD OF REVIEW

The court reviews a Social Security appeal to determine whether the Commissioner's decision "is supported by substantial evidence and based upon proper legal standards." *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997). The court will reverse the Commissioner's decision if it is convinced that the decision was not supported by substantial evidence or that the proper legal standards were not applied. *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991). The court "may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner," but rather "must defer to the Commissioner's decision if it is supported by substantial evidence." *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1997) (citation and internal quotation marks omitted). "Even if the evidence preponderates against the Secretary's factual findings, [the court] must affirm if the decision reached is supported by substantial evidence." *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). Moreover, reversal is not warranted even if the court itself would have reached a result contrary to that of the factfinder. *See Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

The substantial evidence standard is met "if a reasonable person would accept the evidence in the record as adequate to support the challenged conclusion." *Holladay v. Bowen*, 848 F.2d 1206, 1208 (11th Cir. 1988) (quoting *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983)). The requisite evidentiary showing has been described as "more

than a scintilla, but less than a preponderance." *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). The court must scrutinize the entire record to determine the reasonableness of the decision reached and cannot "act as [an] automaton[] in reviewing the [Commissioner's] decision." *Hale v. Bowen*, 831 F.2d 1007, 1010 (11th Cir. 1987). Thus, the court must consider evidence both favorable and unfavorable to the Commissioner's decision. *Swindle v. Sullivan*, 914 F.2d 222, 225 (11th Cir. 1990).

The court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law or fails to provide the court with sufficient reasoning to determine that the Commissioner properly applied the law. *Id.* (citing *Keeton v. Dep't of Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994)). There is no presumption that the Commissioner's conclusions of law are valid. *Id.*

## II. STATUTORY AND REGULATORY FRAMEWORK

To qualify for disability benefits, a claimant must show the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 416(i). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrated by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). Peterson bears the burden of proving that she is disabled, and she is therefore responsible for producing evidence sufficient to support her claim. *See Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003).

A determination of disability under the Social Security Act requires a five-step analysis. 20 C.F.R. § 404.1520(a). The Commissioner must determine in sequence:

(1) Is the claimant presently unable to engage in substantial gainful activity?
(2) Is the claimant's impairment(s) severe?
(3) Does the claimant's impairment(s) satisfy or medically equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
(4) Is the claimant unable to perform her former occupation?
(5) Is the claimant unable to perform other work given her residual functional capacity, age, education, and work experience?

*See Frame v. Comm'r, Soc. Sec. Admin.*, 596 F. App'x 908, 910 (11th Cir. 2015). "An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of 'not disabled.'" *McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986) (quoting 20 C.F.R. § 416.920(a)−(f)). "Once the finding is made that a claimant cannot return to prior work the burden of proof shifts to the Secretary to show other work the claimant can do." *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995) (citing *Gibson v. Heckler*, 762 F.2d 1516 (11th Cir. 1985)).

## III. FACTUAL BACKGROUND AND ADMINISTRATIVE PROCEEDINGS

Peterson was 41 years old at the time of the ALJ's decision. She is single with one college-aged child and lives in Tuskegee, Alabama. R. 177–78. She earned a bachelor's degree in business administration and took courses in a master's program. R. 43–44. Her primary complaints are bursitis in her right shoulder, thyroid problems, significant pain in her right hip and back, and chronic severe migraine headaches caused by pseudotumor cerebri, which have been treated with a variety of surgical procedures, injections, and medications. R. 46 & 51–61. In the past, Peterson worked as a billing clerk and in the

4

purchasing department at Tuskegee University, and as a district manager at a business specializing in payday loans, where she last worked in January 2014. R. 45–51.

Following an administrative hearing, the ALJ found that Peterson did not suffer from any severe impairments in isolation, but that the following impairments are "questionably severe in combination" under 20 C.F.R. § 404.1520(c):

> [O]besity, hypertension, status post lumbar peritoneal shunt placement secondary to questionable pseudotumor cerbri versus headache versus questionable migraine versus benign intracranial hypertension; status post occlusion of the lumpoperitoneal shunt; status post removal broken catheter of shunt; status post removal of entire lumbosubarachnoid shunt system without replacement; status post lumbar puncture times two; questionable history of lumbosacral radiculitis; minimal degenerative disc disease of the lumbar spine; chronic compression deformity of T11, with unclear impact; hypothyroidism; dysmetabolic syndrome; gastroesophageal reflux disease (non-erosive); irritable bowel syndrome, to wit: chronic constipation without clear physiological etiology.

R. 22–23. However, the ALJ concluded at step three of the analysis that none of Peterson's impairments—nor a combination of her impairments—met or medically equaled the severity of one of those listed in the applicable regulations. R. 23. The ALJ further found, at steps four and five, that Peterson has the residual functional capacity ("RFC") to perform a full range of medium work.[1] R. 24.

Ultimately, the ALJ found that because she could perform a full range of medium work, Peterson could perform both all of her past relevant work and other jobs that exist in

---

[1] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work." 20 C.F.R. § 416.967(c).

the national economy. R. 31. He therefore concluded that Peterson was not disabled under the meaning of the Social Security Act from September 1, 2013, through the date of his decision, and denied her claims. R. 31.

Peterson first sought treatment for migraines in 2009 and was hospitalized in April of that year. R. 946–77. Her migraines sometimes contributed to numbness in her face and dizziness. R. 969–76. Three years later in May 2012, she was admitted to East Alabama Medical Center ("EAMC") and treated by Dr. Kishore Chivukula for severe headaches. R. 309–10. A spinal tap revealed a high level of cerebrospinal fluid and elevated intracranial pressure. R. 309–15. As a result, she had fluid drained and was treated with medication to manage her fluid buildup. R. 310. Dr. Chivukula discussed the possibility of inserting a lumbar peritoneal shunt into Peterson's back should the fluid buildup not subside. R. 310.

Later in May, Dr. Chivukula referred Peterson to Auburn Spine and Neurosurgery to see Dr. Wayne Warren, a neurosurgeon. Dr. Warren noted the prior spinal tap demonstrating an elevated level of intracranial pressure, reporting that Peterson was unable to take the medication prescribed to her and was "suffering quite intensely." R. 325. As a result, Dr. Warren diagnosed Peterson with pseudotumor cerebri. R. 325. Dr. Warren discussed the lumbar shunt procedure and Peterson expressed that she was open to the surgery. R. 325. Dr. Warren surgically inserted the lumbar shunt—a catheter system designed to pass fluid from one part of the body to another to prevent buildup and pressure—on June 11, 2012. R. 327 & 329. While Peterson experienced some relief from the lumbar shunt, she began to experience right-sided headaches after sitting upright for 30 to 60 minutes, in addition to neck and lower back spasms. R. 333. Peterson reported that

the headaches were relieved by lying down. R. 333. Dr. Warren ordered physical therapy for her neck and back spasms. R. 331.

On a postoperative visit one month later, Dr. Warren determined that Peterson's residual headaches were "consistent with valve siphoning" in the lumbar shunt and could only be relieved by replacing the lumbar shunt with a cranial shunt. R. 335. Peterson decided to wait to see if her symptoms would subside. R. 335. Dr. Warren diagnosed Peterson with lumbosacral radiculitis, which caused radiating back pain.[2] R. 336. Dr. Warren ordered steroids and an abdominal binder to alleviate Peterson's headaches while standing, and noted that the binder "stopped the siphoning of" the lumbar shunt. R. 338. In August, Peterson reported improvement and Dr. Warren released her to work part-time until her next office visit. R. 338. Subsequent postoperative visits demonstrated that Peterson's symptoms continued to improve, except that she experienced new pain in her leg and back as a result of the lumbosacral radiculitis. R. 340–344. Dr. Warren recommended an epidural steroid injection. R. 344–45.

Following two steroid injections, Peterson's "pressure-like headaches" had returned by early 2013, which were accompanied by blurred vision. R. 349. However, the headaches were still "much better" than they were prior to the insertion of the lumbar shunt. R. 352. In August, 14 months after the shunt surgery, Peterson returned to Dr. Chivukula reporting "oppressive" headaches and back pain that radiated into her legs. R. 963. While

---

[2] Lumbosacral radiculitis is the "inflammation of a spinal nerve root, especially of the portion of the root that lies between the spinal cord and the spinal canal." *Radiculitis*, THE FREE DICTIONARY, http://medical-dictionary.thefreedictionary.com/radiculitis (last visited May 22, 2018).

7

Dr. Chivukula informed Peterson that the shunt was functioning properly and was not the cause of her pain, she requested a referral for a second opinion. R. 364. In December 2013, Peterson reported to Dr. Blake Watson at the University of Alabama at Birmingham ("UAB") Health System for a second opinion, who noted calcification of the falx cerebri[3] and observed that a catheter from Peterson's lumbar shunt was "coiled within the pelvis." R. 901.

Two weeks later, on January 2, 2014, Peterson was admitted to UAB Hospital. She complained of "constant" headaches but maintained that the pain was "tolerable" and she was "able to sit for about six hours" before her symptoms would return. R. 876. She continued to report that her headaches were right-sided and alleviated by lying down. R. 876. Dr. Winfield Fisher surgically repaired the lumbar shunt to allow fluid to drain more effectively. R. 876–79. In the wake of the procedure, Peterson reported that her headaches increased but were less severe. R. 936. However, she experienced increased lower back and abdominal pain. R. 936. By the end of February 2014, Peterson's head and abdominal pain again worsened, causing her to go to the EAMC emergency room. R. 424. An examination revealed a portion of the catheter "coiled" in her pelvis and was "not connected to anything." R. 424. Another portion was coiled over the first, was attached to a port in the abdominal region, and extended into Peterson's spine. R. 424. The disconnected portion of the catheter was surgically removed on February 28, 2014. R. 358–

---

[3] The falx cerbri is "the larger of the two folds of dura matter separating the hemispheres of the brain that lies between the cerebral hemispheres and contains the sagittal sinuses." *Falx Cerebri*, MERRIAM-WEBSTER, https://www.merriam-webster.com/medical/falx%20cerebri (last visited May 22, 2018).

59. Peterson had a spinal tap two weeks later which showed that pressure remained. R. 351–52.

Over the course of the month of March, Peterson's headaches worsened and were again exacerbated by standing. R. 868. Dr. Fisher examined Peterson and wrote a letter to Dr. Chivukula in which he explained that he planned to determine whether there was any additional cerebrospinal fluid leakage and to remove the remainder of the lumbar shunt "in the not-too-distant future." R. 871. However, Dr. Fisher stated that he was "not optimistic" that Peterson would have "significant recovery." R. 871. By this point, Peterson's headaches were an eight on a ten-point scale in severity and she continued to experience back and abdominal pain. R. 857. Dr. Fisher surgically removed the remainder of the lumbar shunt. R. 858. Following the procedure, Peterson experienced several complications, including headaches, severe back pain, and an infection. R. 882–90 & 944.

In May 2014, after removal of the lumbar shunt, Peterson's headaches increased in frequency and severity. R. 947. According to Dr. Chivukula, her headache pain was likely to persist due to the removal of the shunt. R. 947. He discussed with Peterson the possibility of inserting a different shunt. R. 947. Peterson was experiencing daily head and back pain. R. 1083.

Peterson has submitted medical source statements from Dr. Tom Spurlock and Dr. Bantwal Baliga. Dr. Spurlock, a pain specialist at the Alabama Spine & Rehabilitation Center, indicated that Peterson could sit, stand, or walk for one hour out of an eight-hour workday. R. 1112. He also indicated that Peterson would need at least one hour of rest in addition to regular work breaks, including unscheduled breaks. R. 1112. Peterson would

9

require an assistive device due to her back pain and could only rarely perform the following activities: pushing and pulling, climbing and balancing, gross manipulation, bending, and reaching. R. 1112–13. The only activities Peterson could perform "frequently" are fine manipulation (finger dexterity) and operating a motor vehicle. R. 1113. She was also likely to be absent from work more than three days per month. R. 1113. Finally, Dr. Spurlock indicated that Peterson's symptoms were "moderately severe" on a scale that includes "mild," "moderate," and "severe." R. 1113.

Dr. Baliga, an endocrinologist, reported that Peterson could not sit or stand and walk for more than 30 minutes at a time, and would need regular rest breaks as a result. R. 1115. He agreed with Dr. Spurlock that Peterson would need an assistive device and had significant physical limitations, responding that Peterson could never push or pull, bend, or reach, and could only rarely climb or perform gross manipulation. R. 1115–16. He reported that Peterson is "unable to work more than one or two hours daily if that." R. 1116. And Dr. Baliga rated Peterson's symptoms as "severe," consistent with his view that Peterson is unable to work due to chronic headaches, fatigue, back pain, and nausea. R. 1116.

## IV. DISCUSSION

Peterson presents four issues on appeal: (1) that the ALJ misjudged the severity of her pseudotumor cerbri; (2) that the ALJ improperly evaluated her statements regarding the nature and limiting effects of her symptoms; (3) that the ALJ erred in his evaluation of medical source opinions; and (4) that the ALJ's RFC assessment was not based on the

10

record. Because the court agrees with Peterson's second and third contentions, any discussion of her remaining arguments is pretermitted.

**A.    Credibility Findings**

Peterson asserts that the ALJ failed to abide by the Social Security regulations' and Eleventh Circuit's standards in evaluating Peterson's statements regarding her symptoms. Doc. 12 at 8–15. Specifically, she contends that the ALJ failed to apply the requisite factors in evaluating her testimony and neglected to provide specific and adequate reasons for discrediting her testimony. Doc. 12 at 11. For the following reasons, the court agrees.

To demonstrate disability based on testimony of pain or other subjective symptoms, a claimant must satisfy two parts of the Eleventh Circuit's three-part pain standard, which requires "(1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain." *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002). Certainly, an ALJ is free to discredit a claimant's testimony. *See, e.g.*, *Moore v. Barnhart*, 405 F.3d 1208, 1212 (11th Cir. 2005). But a claimant's testimony that is supported by medical evidence and satisfies the pain standard "is itself sufficient to support a finding of disability." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). "Therefore, if a claimant testifies to disabling pain and satisfies the three part pain standard, the ALJ must find a disability unless the ALJ properly discredits the claimant's testimony." *Crow v. Colvin*, 36 F. Supp. 3d 1255, 1259 (N.D. Ala. 2014). "If the ALJ discredits subjective testimony, he must articulate explicit

and adequate reasons for doing so." *Wilson*, 284 F.3d at 1225. Failure to do so requires "that the testimony be accepted as true." *Id.*

Here, Peterson has submitted sufficient evidence of an underlying medical condition, and the Commissioner does not argue otherwise. Peterson's medical records demonstrate that she was diagnosed with pseudotumor cerbri and that elevated levels of fluid caused intracranial pressure and chronic migraines. The records also demonstrate lumbosacral radiculitis in her back, which caused radiating back and leg pain, as well as significant complications resulting from the insertion and removal of a lumbar shunt. From at least 2012 until her application for benefits, Peterson was treated with a variety of prescription medications, steroid injections, and physical therapy. Accordingly, there is ample objective evidence in the record of multiple underlying medical conditions.

The ALJ went one step further, concluding that Peterson's underlying conditions "could reasonably be expected to cause the alleged symptoms." R. 30. However, he found that Peterson's "statements concerning the intensity, persistence and limiting effects" of her conditions were "not entirely credible for the reasons explained in this decision." R. 30. The ALJ went on to point out that Peterson had no apparent mental health issues, that her "examinations were unremarkable for generally [sic] physical limitations," and that her treatment of headaches "was based on subjective reports." R. 30–31. The ALJ concluded that Peterson "suffers no demonstrable limitation in any area of functioning" and that Dr. Spurlock and Dr. Baliga's medical source statements should be given no weight because "not one single radiographic examination provided any support for her allegations." R. 31.

Previously in the opinion, the ALJ provided an extensive overview of Peterson's treatment history. R. 24–30. In it, the ALJ acknowledged Peterson's diagnosed pseudotumor cerbri, intracranial hypertension, elevated cerebrospinal fluid levels, lumbosacral radiculitis, lumbar shunt, and five surgical procedures intended to relieve chronic migraine headaches and back pain. Throughout this portion of the opinion, the ALJ highlighted generally positive findings even if they were unrelated to Peterson's primary medical diagnoses, often observing where Peterson was "doing well," "well nourished," in "no acute distress," had "normal gait," her symptoms were "well-controlled," and the examinations were "unremarkable." R. 25–29.

With regard to Peterson's chronic migraines caused by intracranial hypertension and pseudotumor cerbri, the ALJ focused on the fact that Peterson experienced some improvement in the wake of the lumbar shunt procedure in the summer of 2012. R. 25 ("She indicated that her pre-operative headaches had resolved and she only had right sided headaches when she sits upright for 30 minutes to an hour."). Peterson acknowledged this in her briefing, stating that "[i]nitially, the shunt relieved Ms. Peterson's pressure-headaches." Doc. 12 at 12. In a subsequent postoperative visit, in which Peterson complained of neck and back spasms and Dr. Warren ordered steroids and an abdominal binder, the ALJ noted that Peterson had "no joint or limb tenderness to palpitation, no edema and no ecchymosis." R. 26. "She had motor functioning of 5/5 in all muscle groups with normal gait and station." R. 26. Later, when discussing the complications associated with Peterson's lumbar shunt, the ALJ observed that, following its removal, Peterson's

pain was "well controlled on pain regimen and she was discharged in stable medical and neurologic condition." R. 26.

Crucially, the ALJ never explains how any of the positive findings he highlights are even related to Peterson's complaints—let alone how they would discredit them. In fact, the court cannot find anywhere in the ALJ's voluminous discussion of Peterson's treatment history that the ALJ specifically articulated his reasons for disbelieving Peterson's testimony regarding her symptoms. Instead, he summarizes the medical records, balancing statements concerning Peterson's migraines, back pain, pseudotumor cerbri, and lumbar shunt with generally positive observations that are often unrelated to the claimed symptoms. He then states in conclusory fashion that Peterson's statements were "not entirely credible" and her "statements rely almost exclusively on her subjective reports." R. 30–31. However, "[s]uch a broad credibility finding is not sufficient under" Eleventh Circuit precedent. *Snyder v. Comm'r of Soc. Sec.*, 330 F. App'x 843, 848 (11th Cir. 2009). And an ALJ cannot discredit testimony regarding pain "solely based on the lack of objective medical evidence." *Id.* Accordingly, the court concludes that ALJ's determination regarding Peterson's credibility is not supported by substantial evidence and is grounds for reversal.

**B. Medical Source Opinions**

Peterson also asserts that the ALJ improperly disregarded the medical source opinions submitted by Dr. Baliga and Dr. Spurlock. Doc. 12 at 15–18. In reply, the Commissioner contends that there is no evidence in the record that Dr. Spurlock is a treating physician but that, in any event, the ALJ properly granted the opinions little weight

because they were "unsupported by objective evidence." Doc. 13 at 12. It is unclear from the record whether Dr. Spurlock can be considered a treating physician. However, the court concludes that, regardless of Dr. Spurlock's status as a treating physician, the ALJ has failed to satisfy his burden of clearly explaining his reasoning for disregarding Dr. Spurlock's and Dr. Baliga's opinions.

Regardless of an ALJ's personal feelings or suspicions, "as a hearing officer he may not arbitrarily substitute his own hunch or intuition for the diagnosis of a medical professional." *Marbury v. Sullivan*, 957 F.2d 837, 840–41 (11th Cir. 1992) (Johnson, J., concurring). While an ALJ is free to discredit the diagnosis of a treating physician, he may only do so only when he has clearly articulated specific reasons for doing so, *see Hale v. Bowen*, 831 F.2d 1007, 1012 (11th Cir. 1987), and the reasons are supported by substantial evidence in the record. *See Lamb v. Bowen*, 847 F.2d 698, 703 (11th Cir. 1988). "In the absence of such a statement, it is impossible for a reviewing court to determine whether the ultimate decision on the merits of the claim is rational and supported by substantial evidence." *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981). "Therefore, when the ALJ fails to 'state with at least some measure of clarity the grounds for his decision,' we will decline to affirm 'simply because some rationale might have supported the ALJ's conclusion.'" *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011) (quoting *Owens v. Heckler*, 748 F.2d 1511, 1516 (11th Cir. 1984)). This is because—when the ALJ fails to meet this burden—affirming the decision would amount to an "abdication of the court's duty to scrutinize the record as a whole and to determine whether the conclusions reached are rational." *Id.* (internal quotation marks omitted).

Here, the ALJ summarily rejected the opinions of both Dr. Baliga and Dr. Spurlock by stating that "not one single radiographic examination provided support for any of [Peterson's] allegations," and "the evidence of record is inconsistent with their opinions." R. 31. The statement that none of Peterson's radiographic examinations provided support for her allegations is perplexing, as the ALJ does not explain how this is an adequate basis for completely rejecting the two medical source opinions.[4] "[C]onclusory statements . . . to the effect that an opinion is inconsistent with or not bolstered by the medical record are insufficient to show an ALJ's decision is supported by substantial evidence unless the ALJ articulates factual support for such a conclusion." *Kahl v. Comm'r of Soc. Sec.*, 845 F. Supp. 2d 1262, 1272 (M.D. Fla. 2012). In briefing, the Commissioner essentially asks the court to sift through the record to find "good cause" for the ALJ's complete rejection of Dr. Baliga's and Dr. Spurlock's decisions. Doc. 13 at 12. But the court is expressly prohibited from affirming an ALJ's decision simply because "some rationale" might have supported it, and the Commissioner's reasoning ignores that the ALJ's failure to articulate a specific basis for rejecting both opinions constitutes reversible error in and of itself. *See Winschel*, 631 F.3d at 1179.

Further, an ALJ must give substantial weight to the opinion of a treating physician unless the: "1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or

---

[4] Moreover, while it is not this court's responsibility to reweigh the evidence, the record clearly demonstrates that Peterson's elevated fluid levels caused pressure in her head and back, prompting the pseudotumor cerbri diagnosis and subsequent lumbar shunt procedures. She also experienced significant complications with the placement of the lumbar shunt and suffered from radiating pain in her back and legs as a result of lumbosacral radiculitis.

inconsistent with the doctor's own medical records." *Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004). Not only did the ALJ here fail to give Dr. Baliga's opinion substantial weight—he gave it no weight at all. R. 31. Yet, aside from two conclusory statements, the ALJ provided no explanation as to how Dr. Baliga's opinion was either not bolstered by—or contrary to—the medical evidence of record. And there is no indication that Dr. Baliga's opinion was inconsistent with his own prior records of Peterson's examinations. Thus, the ALJ's failure to explain his reasons for disregarding the opinions of Dr. Spurlock and Dr. Baliga constitutes reversible error.

## V. CONCLUSION

Based on the foregoing, the undersigned concludes that the Commissioner's decision is not supported by substantial evidence and based upon the proper legal standards. It is therefore ORDERED that the decision of the Commissioner denying benefits is REVERSED and this matter REMANDED to the Administrative Law Judge for the purpose of issuing a new disability determination consistent with this opinion.

A final judgment will be entered separately.

DONE this 22nd day of May, 2018.

GRAY M. BORDEN
UNITED STATES MAGISTRATE JUDGE